UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
MSN Air Service, Inc., and Roopnarine (Rudy) Singh, :
                                                      :
                    Plaintiffs,              :  Civ. No.:
                                                      :
-against-                                             :
                                                      :     Complaint and Jury Demand
Port Authority of New York and New Jersey, Donald :
Rivas, in his individual and official capacity, John and :
Jane Does 1-10, in their individual and official      :
capacity,  XYZ Corporations 1-10.,                    :
                            Defendants.               :
--------------------------------------------------------------- X

## INTRODUCTION

This case is about Roopnarine (Rudy) Singh and MSN Air Service Inc., a thriving cargo handling and ground handling business at JFK airport that was denied for about twenty years by Defendant the opportunity to lease available cargo facility space and develop business because he is a minority owned enterprise.

Since 1995 on nearly every occasion a cargo building became available on the Defendant property listing for leasing, the Defendants create unequal lease requirements for Plaintiff, would promise a lease to Plaintiff but not deliver it, require Plaintiff to submit documents and information no other potential tenant was required to submit, and ultimately deny the property to Plaintiff.  Defendants' conduct was the result of unlawful desire to not lease space to minority owned business.  The Defendants had a policy and custom of not renting cargo space to minority owned businesses.  Indeed, many of the spaces Plaintiff applied for and was qualified for, were denied to him, and instead either arbitrarily given to less qualified non-minority business or permitted to remain vacant for

more than twenty years after denying it to the Plaintiff. Defendant continues to receive federal grants from the Government annually to operate JFK airport and continues to squander the grants by having the utilities, heating and AC running in all of the empty cargo warehouses that Plaintiff applied for and the airport maintenance company, Meridian, continues to be paid for maintenance of the empty properties for more than twenty years now.

JURISDICTION AND VENUE

1. This court has jurisdiction over this action under 42 U.S.C. §1983 and under 28 U.S.C. §§ 1331 and 1343(4).

2. Venue is appropriate in this District as all of the acts giving rise to this action occurred within this District and the Defendant resides in this District.

PARTIES

3. Plaintiff has been a Cargo Terminal Operator and Aircraft Ramp Handling company since 2005 and a Port Authority certified minority business enterprise (MBE) since 2007, respectively. Plaintiff's principal place of business is Cargo Building 86, JFK International Airport, Jamaica, New York 11430.

4. The president and owner of MSN Air Service, Inc. is Roopnarine (Rudy) Singh. Mr. Singh's national origin is Guyana.

5. The Port Authority of New York and New Jersey ("Port Authority") is a government agency of the States of New York and New Jersey, at all times

operated John F. Kennedy Airport, in Queens New York, and maintain an address of 225 Park Avenue South, 15th Floor, New York, NY 10003.

6. Donald Rivas was an employee and agent of the Port Authority and was assigned to John F. Kennedy Airport, in Queens, New York, and at the time of some of the incidents was a high ranking official in charge of property management and leasing for Defendant Port Authority. He had the authority to manage the rental properties at the Port Authority and award leases.

7. John and Jane Does 1-10 represent other high ranking decision makers who unlawfully violated Plaintiffs' rights.

8. Port Authority, Don Rivas, and John and Jane Does 1-10 are hereinafter referenced as "Defendants."

<u>FACTS</u>

9. Beginning in 1995 to 1998, Plaintiff applied with Defendant to lease one of the many empty cargo warehouse spaces Defendant had available on its property list for leasing; Hangar 3, Hangar 4 and Hangar 5. Plaintiff communicated with Gordon Burnham and David Hennessy regarding leasing one of the Hangars. Both Hennessy and Burnham stated that the space is available and negotiation started. Plaintiff made many visits to the buildings and a proposal was made. Plaintiff was promised a lease proposal; in late 1997 Plaintiff was told by Defendant that the buildings are off the market and cannot be rented. The three

hangars of about 300,000 square feet still sit vacant and are maintained by the Port Authority (Meridian) using federal funds.

10. Between the years 1998 to 2000, Plaintiffs communicated with Gordon Burnham and David Hennessy regarding leasing Building 80 or building 81, which were vacant warehouse spaces on Defendant's property. As the parties got closer to drafting a lease, Plaintiff was abruptly and without any justification informed by Burnham that Defendant could not lease Building 80 to Plaintiff because the space had to be given to another company, AFCS, a non-minority owned business.

11. Plaintiff was also in contact with Gary Wenger whom informed Plaintiff that he, Gary Wenger, was the acting manager for Defendant responsible for leasing properties for the Port authority.  Plaintiff and Mr. Wenger discussed Building 142 for a number of years. Throughout this time, Mr. Wenger facilitated Plaintiff with many visits to Building 142 with his contractors as the parties grew closer to drafting a lease. Again, and abruptly and without any legal justification, Building 142 was made unavailable to the Plaintiff and was rented out later to a non-minority business.

12. During 1999 to 2002 U.S. Customs was using Building 81as a training facility for their dogs. The space was too large for a training facility; Plaintiff was contacted by Nicholas Houselog and asked if he would be interested in this new offer at Building 81. Plaintiff agreed and gained access to Building 81 on many occasions with his contractors.

13. As the parties grew close to drafting a lease, the Plaintiff was abruptly and without any legal justification informed by Houselog that Defendant decided it would allow U.S. Customs to continue to use the entire building and, as such, could not lease him a portion of the building. The Building sat vacant for a number of years, at which point a non-minority company, Jet Blue Airways, leased the entire building without any formal RFP or procurement process.

14. In September 2000, Plaintiff was contacted by David Hennessy expressing his interest to lease a portion of the vacant space in Building 68 to Plaintiff and requested a proposal to prepare a lease. Plaintiff also presented Mr. Hennessy a proposal in September and was promised a lease within one month. He gave Plaintiff a set of keys to the building so that Plaintiff could begin painting and carpeting while a lease was being prepared. Plaintiff completed the upgrade to Building 68's vacant spaces.

15. In December 2000, however, Mr. Hennessy informed Plaintiff that he could not give him the space. Mr. Hennessy's manager, Gary Wenger, informed Hennessy that the space had to be leased to an existing tenant. Plaintiff was abruptly and without any legal justification denied the opportunity to lease the space and the space was leased to an existing, non-minority tenant, AFCS, without any formal procurement process.

16. AFCS went out of business in 2005 and failed to pay rent owed to the Port Authority. Building 68's space remained vacant and was maintained by the Port Authority from 2005 to 2012 and was later boarded up.

17. In April 2004, Plaintiff made contact with Defendant Abraham Friedman, a property representative, at which point Friedman offered to lease Building 68's vacant space, former Antillas Air section, to him. Friedman gave Plaintiff multiple accesses with his contractor to the space. A proposal was submitted to the Defendant in June of 2004 with a scope of work to renovate the building, which was accepted in full and Defendant agreed to the cost of the job and promised a lease to Plaintiff within three months. In September 2004 for no lawful reason, Plaintiff was informed by Defendant that the space is off the market due to a study of the airport and cannot be rented at the moment. Plaintiff was never contacted again about Building 68. It was later boarded up in 2012.

18. During 2001 and 2002, Plaintiff was in communication with Nicholas Houselog and other property representatives for the Defendant regarding leasing vacant Building 83/84. Both parties agreed the Plaintiff would have to make capital investments into the building. Just as in his previous dealings with Defendant, Plaintiff was granted access to the buildings multiple times with architect and contractor, a proposal plan was in place to erect a divided wall, and an understanding to lease twenty to thirty thousand square feet warehouse space plus office. The parties were again close to drafting a lease.

19. On March 28, 2002, Plaintiff was informed via letter by Defendant that, due to a big interest in Building 83/84 from a non-minority tenant, Defendant would lease the space based on a competitive process. Plaintiff was then advised by

Mr. Houselog that he would later be provided with material associated with the lease process. Plaintiff remained in contact with Mr. Houselog until December of 2004 but was never provided with said material for Building 83/84. Defendants refused to lease Building 83/84 to the Plaintiff and said it is off the market; the building was maintained with federal funds and sat empty until 2012 when it was boarded up.

20. During 2002, Plaintiff also dealt with Mr. Houselog regarding the vacant space in Building 80.  Houselog provided Plaintiff with a document dated September 26, 2002 stating the eight requirements to secure a lease of Building 80.

21. In October 2002 Mr. Houselog informed Plaintiff that Building 80 was off the market due to an evaluation process and big interest in the space and that he would inform Plaintiff when it became available again. The Plaintiff was never contacted again about the building. Building 80 remained vacant until 2012 when it was boarded up.

22.  Plaintiff continued to communicate with Defendant regarding entire Building 142. Mr. Houselog gave Plaintiff multiple occasions of access to the Building in 2002-2003.

23. Plaintiff and Mr. Houselog were close to finalizing a lease; Plaintiff again was informed by Houselog that Building 142 was no longer on the market because the property had to be leased to a non-minority company, the snow removal company. The building sat empty for many years before it was rented.

24. Plaintiff was referred by Houselog in 2003 to retain The Aviation Group (TAG), an aviation consulting company, which is operated by retired JFK manager, Gary Wenger, to help Plaintiff secure a lease with Defendant. During the referral conversation on JFK ground, an argument erupted with Plaintiff and Houselog because the Plaintiff believed Wenger and Houselog were collaborating in their attempts to refuse to lease to the Plaintiff. The Plaintiff refused to retain TAG.

25. Plaintiff was later contacted by Wenger (TAG) who said he was referred by Defendant's property representative, Nicolas Houselog, from whom he acquired Plaintiff's phone number to help Plaintiff secure a lease with Defendant.

26. Plaintiff signed a consultant agreement with Gary Wenger (TAG) effective March 10, 2004 expire March 9, 2007.

27. In February 2005, after ten years of constantly and regularly applying  for the many empty cargo buildings Defendant had available on its property list for leasing, Plaintiff became a tenant of Defendant, holding a lease for the middle portion of Building 86 with one jumbo jet aircraft parking position. Defendant property representative, Laura Garland, delivered a lease to Plaintiff.

28. Plaintiff was defrauded and robbed by Defendant of his investment money to refurbish Building 86 and make it habitable prior to commencing operation.

29. Other non-minority companies who made capital investments into their buildings were given rent credit from the Defendant as a form of reimbursement.

30. On July 15, 2005, August 24, 2005, and September 2, 2005, Plaintiff was sent invoices by retired JFK property manager Gary Wenger (TAG) for consultation fees to negotiate Building 86's lease with Defendant on behalf of Plaintiff.

31. Gary Wenger documented in his invoice all communication with Defendant's property representative, Laura Garland, on behalf of MSN Air Service Inc.

32. Despite promises made by the Defendant regarding Plaintiff potentially leasing space, the Plaintiff never received a rent free period in his lease for investment and improvements made to Building 86 which other non-minority tenants received.

33. Despite Plaintiff acquiring said lease, which was the least desirable building available, Defendants did their best to kill Plaintiff's business prospects by not giving him the JFK airport ID card and Privilege permit to commence operation until six months after his lease start date and while he was paying rent of $32,000.00 per month.

34. As per Defendant's protocol, Plaintiff must have valid cargo handling contracts from airlines for the majority use of the lease space before qualifying for a lease; all of which was in position with Defendant.

35.  At the time Plaintiff's current location and place of business was Building 86 that was rented to Plaintiff for $32,000.00 per month effective June 1, 2005 but was pushed back to July 1, 2005 due to late issuance of JFK Airport ID card by Defendant.

36. Building 86 was an old and undesirable building.  This is the only building the Defendants made available to the Plaintiff, and they did so at a rate higher than the rate for a modern building that housed non-minority companies.

37. As per Defendant's protocol, Plaintiff was to be issued a JFK Airport ID card to gain access to the airport and JFK Airport privilege permit to perform handling services prior to commencing of lease and before being permitted to commence its operation.

38. This process would typically take four (4) to six (6) weeks; however, Defendants did not issue Plaintiff an ID card until six (6) months after he had become a tenant, which was ten (10) month after the initial processing of the ID documents.

39. Upon inquiring with the JFK airport ID Security Manager, Michael Bollella, Plaintiff was informed that he would not be given an ID card because he did not "belong" to the airport and because his last name is Singh, which identified him as a minority.

40. Plaintiff's functions are classified as cargo terminal operation. In order to perform said functions, Plaintiff needs direct access to the air field. Without JFK Airport ID card, Plaintiff was unable to perform its functions or operate its business no other non-minority company was treated in this manner.

41. Moreover, Plaintiff was required to have anchor tenants to justify obtaining a lease from Defendant. Plaintiff obtained said business and formed contracts

with several new businesses that expected Plaintiff to begin operating on June 1, 2005.

42. In June 2005, seeing that Plaintiff had not yet been issued an ID card and privilege permit and was not able to commence operations, two of the anchor tenants Plaintiff had entered into contracts with cancelled their contracts and went with other handling company. Plaintiff loss of revenue was more than $90,000.00 per month.

43. In the six (6) months that Plaintiff waited to be issued his ID, Plaintiff was still required to pay his rent of $32,000.00 per month for 16,000 square feet of building/ warehouse space plus one aircraft parking despite having lost business and despite not having the necessary access and privilege permit to commence operations as a result of the Defendants' actions.

44. In late October of 2005, Defendant finally issued Plaintiff an ID card. In November of 2005, Plaintiff was issued a privilege permit. Plaintiff immediately began seeking new anchor tenants to pick-up. It was not until July 2006, however, that he was able to pick-up new business when one of the original anchor tenants returned and a full-scale operation began.

45. It is estimated that in addition to paying approximately 12 months of rent for a limited business, Plaintiff lost approximately $1,800,000 worth of contracted business due to the lateness of ID card and privilege permit the Defendants manufactured and perpetrated.

46. The delay associated with providing the Plaintiff an ID card was caused because of his minority status. No other, non-minority service provider at JFK airport had their ID card delayed several months because of their name.

47. Thereafter, in the year 2006, having outgrown the space it currently leases, Plaintiff sought the opportunity to extend its business. Plaintiff made several requests with Defendant to lease Building 78 a 150,000 square feet building plus offices with about 9 acres of land, which is a larger and more modern cargo facility available on Defendant's property list for leasing since the year 2000.

48. Plaintiff was granted multiple access by Defendant's property representative, Abraham Friedman, to evaluate Building 78.

49. On August 9, 2006, Mr. Friedman sent a lease proposal to Plaintiff. Thereafter on August 26, 2006, Plaintiff sent Mr. Friedman a counterproposal. Several meetings ensued in which Mr. Friedman informed Plaintiff that he would be drafting a formalized lease for Plaintiff with the objective of having Plaintiff slowly grow into the building.

50. On November 1, 2006 Defendant property manager, Howard Goldsman, a high ranking official for leasing, informed Plaintiff that the Port Authority is in the process to evaluating the airport's overall space and would be in contact with Plaintiff. This was the same excuse that was given to the minority Plaintiff multiple times when he expressed interest in Building 80 in 2002.

51. Plaintiff was denied Building 78, which has been vacant since 2000, for no lawful reason. As of October 2014, building 78 is 150,000 square feet modern cargo facility remains vacant and being maintain by the Defendant.

52. Plaintiff can only come to the conclusion that the Port Authority is squandering federal funds it receives by stopping minority business from developing in the cargo arena and continues promoting non-minority monopoly in JFK airport.

53. Plaintiff proposed Defendant a higher than the normal rent rate for Building 78 and for no lawful reason Defendant refused to accept the offer and kept the building empty, wasting federal dollars it collects and continues to promote monopoly in JFK airport cargo handling arena. As of October 2014, Building 78 still sits empty and is being maintained by Defendant.

54. Don Rivas, a high ranking property and leasing manager in JFK Airport met with non-minority Plaintiff's competitor and discussing how he will contain the minority Plaintiff and suggested to airlines which service provider to form contracts with and the future for the ARK company and building 78.

55. Plaintiff also contacted Mary Grace Sileo regarding Building 73 a 50,000 square feet modern facility that the Defendant has on it property list for leasing. On March 14, 2006, Ms. Sileo provided rental rates for Building 73 to Plaintiff. On May 23, 2006, Sileo provided Plaintiff with more information relevant to leasing the building.

56. About June or July 2006, however, Plaintiff was informed by Ms. Sileo that the building was off the market because Emirates Airlines had to vacate their

current facility, Building 79, due to American Airlines' purchase of the building.

57. Defendant informed Plaintiff that building 73's space would have to be given to Emirates Airlines and Plaintiff's competitor, CAS, a non-minority business.

58. Defendant violated the Port Authority rules and rented Building 73 to a non-minority business without any RFP process.

59. Plaintiff communicated with Patrice James, a property representative of Defendant, during 2007 and inquired once again about leasing Building 83/84 which has more than 100,000 square feet of warehouse plus offices.

60. Ms. James and Plaintiff were getting close to drafting a lease for the building when Ms. James unilaterally and without any legal justification informed Plaintiff that the building was off the market due to a study of the airport. This was the same excuse that was used by the Defendant for Building 80 in 2002 and Building 78 in 2006.

61. Ms. James further informed Plaintiff that she would let him know when the building was placed back on the market. Plaintiff never heard back from Ms. James regarding said building. It was maintained during the years until 2012 Building 83/84 was boarded up.

62. Other non-minority company was given lease to spaces with any struggle.

63. During 2007 and 2008, Plaintiff contacted Patrice James regarding Building 260, a 100,000 square foot building, Defendant had on its property list for rent. Plaintiff was permitted to retain and bring architects and construction companies

to evaluate the building. A finalized draft of the lease was close to being completed when the process slowed down.

64. On February 26, 2008, Plaintiff was informed that the delay was due to a study being conducted by Defendant for the area because Delta Airlines wanted to develop a section of the surrounding building 260 area.

65. Defendant promised to restart negotiation with Plaintiff after the study but was never contacted again about building 260.

66. In 2008 and 2009 Plaintiff contacted Ms. James and was told both times that the building is off the market; the development never happened and the building still remains empty and was later boarded up in 2012.

67. On May 15, 2008, Plaintiff requested to rent the "N" section of Building 86 20,000 square feet (a section of Plaintiff's current building). On May 16, 2008, Defendant informed Plaintiff that they will be performing an assessment of JFK, which would postpone negotiations of Building 86 until its completion at the end of the year and Defendant will contact Plaintiff after the assessment. Plaintiff was not contacted again for building 86.

68. On January 20, 2009, Plaintiff requested to Defendant again to rent the N. section of Building 86 a 20,000 square feet.

69. On the same day on January 20, 2009, Plaintiff received a reply from Defendant that the Building 86 is a 20,000 square feet set aside for the animal clinic (Vet Port) the current animal clinic has about 5,000 square feet in JFK and remain in the same building for the past 30 years to October 2014.

70. Building 86's space remained empty and being maintained until October 2014.

71. During 2012 Plaintiff was promised a lease by Defendant for building 78 a 150,000 square feet building as the parties got closer to drafting a lease Plaintiff was informed by Defendant that building 78 will be given to the Vet Port (animal clinic). Building 78 still remain empty as of October 2014

72. The animal clinic still remains in the original 5,000 square feet facility where it has been for the past thirty years.

73. On February 2010 during the recession, Plaintiff was contacted by Ms. James, who offered Plaintiff to lease the empty portion of Building 66, which has about 32,000 square feet of warehouse that became available after British Airways, a non-minority company, vacated part of their lease to save money. The Port Authority reclaimed this portion of Building 66 during the recession at the request of British Airways in order to help the company through the tough economic period.

74. A lease was verbally formalized between Ms. James and Plaintiff for the empty portion of building 66 with a draft to follow.

75. Ms. James decided to check with and inform property leasing manager, Don Rivas, about the business with Plaintiff whom then informed Ms. James that the vacant space in Building 66 would be given to Plaintiff competitor, CAS, a non minority business.

76. Upon solid and documented information from Defendant, CAS, a non-minority business, did not have to apply for the space. Defendant leased building 66

empty spaces to CAS in an unlawful effort without an RFP process just to keep it away from Plaintiff. Defendant violated its own rules that it is supposed to govern by and discriminate against the minority Plaintiff.

77. Building's 66 spaces was a habitable turnkey space and did not need any cash investment for construction or upgrade.

78. All the property that Defendant offered Plaintiff needed hundreds of thousands of dollars cash investment from Plaintiff to make the building habitable and the Defendant made it clear to the Plaintiff up front.

79. Defendant gave CAS two (2) years time to grow into building 66's empty space or when their current cargo tonnages inside their current warehouse surpass 84 million kilos per year, whichever comes first.

80. In 2006 the Defendant also violated its own rules it supposed to govern by and leased building 73 to CAS a non-minority company without any RFP process just to keep the minority Plaintiff out of the cargo handling arena.

81. Plaintiff contacted Defendant, Michael Ferrigno, on November 30, 2009 during the economic recession and because of the Plaintiff's inability to house one aircraft load of cargo within his building number 86, the Plaintiff sought to relinquish a part of his lease, the aircraft parking spot, just to save money and stay in business. On January 4, 2010, Defendant, Laura Garland, refused and did not accept this offer, stating the Port Authority could not justify the need for additional aircraft parking space known as ramp space.

82. The Plaintiff has been forced to continue paying for the aircraft parking spot, costing more than $10,000.00 per month despite the building's inability to accommodate one aircraft load of cargo.

83. During January 2010 British Airways a non-minority company relinquish a portion of their lease at building 66; 32,000 square feet of warehouse and one aircraft parking position costing in rent about $60,000.00 per month just to stay in business during the rescission.

84. The Defendant discriminates against the minority Plaintiff to relinquish portion of it lease compare to British Airways a non-minority just to force him out of business but he survive the rescission.

85. Thereafter, in late 2010, Plaintiff contacted Defendant about leasing Building 78 again which sat empty since 2000.

86. Plaintiff has not heard back from Defendant regarding Building 78 since November of 2006 although Defendant promised (4) years ago to inform Plaintiff about leasing Building 78.

87. After four years of constantly trying to expand and seeing no results, Plaintiff decided to bring his issues to the attention of Councilman James Sanders, representatives of Congressman Gregory Meek's office, Ricardi Claxite executive director of Queens Economic Development Council (QEDC), and Vishnu Mahadeo (executive director of Richmond Hill Economic Development Council).

88. On February 23, 2011 a meeting was held in Councilman Sanders' office with the aforementioned individuals, Plaintiff, and Defendant representatives, Ralph Tragale and Michael Ferrigno, of the Port Authority.

89. During said meeting, Defendant made a commitment to facilitate leasing Building 78 to Plaintiff after 8 months of continued "customer in good standing."

90. Plaintiff remained in good standing and did everything required by Defendant for him to qualify for the lease for Building 78.

91. Several years have passed and Defendant has not stuck to its commitment that it made at that meeting.

92. On May 14, 2012, Plaintiff received a letter from Don Rivas forcing Plaintiff again to put another proposal in formal writing with his business plan for Building 78.

93. Upon information and belief, Don Rivas was one of the primary actors who participated in unlawfully discriminating against the Plaintiff and withholding these properties from him.

94. Despite the fact that no other non-minority business was required to put together such plan to lease space and increase business, Plaintiff did as he was told.

95. Plaintiff was later informed by Defendant that the Defendant was in negotiations with another proposed non-minority tenant and cannot rent Building 78 to Plaintiff.

96. As such, Defendant also requested that Plaintiff provide a business history of its customer base for its time as a tenant of Defendant.

97. Defendant had Plaintiff's historic information in its data base as a tenant since 2005 and the information has been mandatorily updated on a month by month basis. It was clear that the Defendant sought more ways to create unequal leasing requirements and delay the minority Plaintiff.

98. Again, despite the fact that no other non-minority business had to comply with a unilateral and arbitrary requirement, and the Plaintiff was already promised said building, Plaintiff provided Defendant with a package in September 2012.

99. Plaintiff has since heard nothing further from Defendant regarding Building 78. Said building was given to the Vet Port (animal clinic) in 2012 without an RFP process in order to sever the deal with the minority Plaintiff. The building still remains vacant to this day in October 2014. In 2009 Plaintiff was told that building 86 was a set aside for the Vet Port (animal clinic) which still sat empty as of October 2014.

100. Plaintiff made a presentation to Defendant's (Port Authority) Board of Directors Meeting in September 2012 with a time limit of three to five minutes to demonstrate his years of struggle with the Defendant to obtain a lease for Building 78 that sat empty since 2000 and maintained by squandering of federal funds by the Defendant.

101. The Defendant told the Port Authority board members otherwise and Plaintiff's demonstration was in vain.

102.    In 2012 after Building 78 was awarded to the animal clinic (Vet Port), Plaintiff shifted his focus onto Building 263 that Defendant had available on its property list for leasing.

103.    Plaintiff presented a proposal to Defendant in the first quarter of 2013 to invest $3,600,000 dollars upgrading to Building 263 which is in a very poor condition and not habitable without renovation.

104.    From March 2013 to October 2014, the Defendants claimed they are still working to prepare a lease for the Plaintiff; no other non-minority business has to wait for such a long time to obtain a lease.

105.    Don Rivas, a senior property and leasing manager, and Dean Mancuso, a senior property representative for leasing, have created numerous, unequal situations in order to stall the proposal process of building 263 just to promote monopoly in the JFK cargo arena by non-minority company.

106.    Plaintiff took action against Defendant in US Federal Court in February 2014. Defendant agreed for a 6 months' time to discuss settlement of the case and leasing Building 263. But nothing has changed in the last six month and Plaintiff now comes before the court again to initiate a new case against Defendant before the 6 months statute expires to expose Defendant actions against the minority Plaintiff.

107.    In 2012, Plaintiff acquired the business of Air India, which had vacated the neighboring space in Building 86. Plaintiff requested that Defendant allow Plaintiff to lease the neighboring portion of building 86 and place Air India in

its former space. This request was arbitrarily and unlawfully denied to the minority Plaintiff. Building 86 still remains empty as October 2014.

108.     Defendant then referred Plaintiff to a third party landlord whom Plaintiff was able to rent from in Building 87 (Evergreen Airlines) Plaintiff service Air India account at building 87 for about one year.

109.     Evergreen Airlines was going out of business and requested Plaintiff to vacate building 87.

110.      Plaintiff lost Air India's business due to lack of warehouse accommodation.

111.     In March or April of 2012, after numerous inquiries from the Plaintiff, Dean Mancuso contacted Plaintiff with an offer to rent space in Building 87.

112.     Mr. Mancuso provided rental rates. Plaintiff became aware that the rates were high and were not for 2012 but for 2019. Plaintiff brought this to the attention of Mr. Mancuso whom informed Plaintiff that the rates were correct and that they could not be lowered.

113.     No other non-minority business was asked to pay rent rate for 2019 during 2012.

114.     Moreover, Building 87 is outdated and unwanted by all other tenants.

115.     Nearing the end of 2012 through 2013, Plaintiff made one last effort to lease a space that became vacant when Asiana Airlines vacated Building 263 in 2008.

116.    Building 263 East Section became vacant in (2008-2009) Plaintiff was given multiple access to the building in March 2013 by Dean Mancuso a senior property representative  and Don Rivas a senior manager for property and leasing both gave approval to market and show building 263 space to prospective and current client airlines.

117.    Plaintiff presented Defendant with a construction proposal cost to make a capital investment of about $3,500,000 dollars for approximately 100,000 square feet of warehouse and offices at Building 263, a modern cargo facility that sat vacant since 2000.

118.    On March 6, 2013, Plaintiff met with Don Rivas to discuss the space and Plaintiff's improvement plans.

119.    Mr. Rivas found these plans agreeable with a cost estimate of $3,500,000 dollars cash investment and requested Plaintiff's financial records from 2005 to 2012 which were provided to Defendant. No other non-minority with existing business in JFK whom want to expand was required to submit financials to Defendants in this manner or method.

120.    Defendant requested a formal letter from Plaintiff expressing the company desire to become an anchor tenant in Building 263, which was also provided.

121.    Defendants promised that a follow-up meeting was to be held.

122.     Between March 2013 and July 2013 when the next meeting was held, Plaintiff was permitted to continue showing and marketing the space to potential and current clients.

123.     On April 16, 2013, Dean Mancuso, Defendant's employee, promised to send Plaintiff a proposal for Building 263 and said that he is working on it, but did not send it to Plaintiff within a reasonable timeframe.

124.     In 2013 Donald Rivas directed Plaintiff to lease space from a third party monopoly real estate competitor who has business restriction on its property.

125.     On July 26, 2013, the follow-up meeting was held inside Building 263, in which Plaintiff was informed by Don Rivas that DHL wanted to take a portion of the building. Plaintiff felt that the division would not be practical. And a heated argument ensued. Defendant then told Plaintiff that he would have to lease out the entire building if that was the case with no option of growing into the property.

126.     With no viable alternatives, Plaintiff agreed and told Don Rivas that the Port Authority continues to use federal funds to keep the building empty and to block Plaintiff, as a minority and small business, from developing.

127.     During 2005, the Defendant gave NASS, a non-minority owned business, the opportunity to grow into Building 87 and in 2010, the Defendant gave CAS, a non-minority business, 2 years' time to grow into Building 66.

128.     A commitment was made by Mr. Rivas to lease building 263 property to the Plaintiff. Mr. Rivas promised he would provide a draft lease by August 2013. However, no lease was ever sent to Plaintiff.

129.    Without prior notice, the Defendants changed the qualification requirements for the minority Plaintiff to obtain a lease and all communication ceased from the Defendant; this never happen to other non-minority business.

130.    Plaintiff continued to make inquiries about building 263 and always received as a response that his application was still under review for building.

131.    In October and November of 2013, Plaintiff requested to market Building 263. Both times, Plaintiff's request was denied by Defendant.

132.    Defendant gave other non-minority businesses fair business opportunities.

133.    As a result of building 263, Plaintiff lost its current contract with Argentina Airlines after 8 years of service, who felt that Plaintiff's current location (Building 86) was inadequate and believed that Plaintiff would simply not be able to expand into Building 263 and moved to another competitor, ( AGI).

134.    On December 19, 2013, Plaintiff sent a letter to Defendant, seeking to resolve the matter with the lease for Building 263.

135.    Plaintiff asked that a response be sent the latest by January 8, 2014. Like all other times before, Defendant failed to follow-up and never responded to Plaintiff's letter.

136.    On February 17, 2014, Plaintiff sent a final communication to Defendant, inquiring when to expect the lease proposal for Building 263. Like all other times before, Defendant failed to follow-up and never responded to Plaintiff.

137.    Defendants intentionally, purposefully and willfully caused the deprivation of Plaintiffs' constitutional rights to equal protection under the law.

138.   At all relevant times, Defendants acted under the color of state law in willfully and purposefully depriving Plaintiffs of constitutionally guaranteed rights.

139.   Defendant discriminated against the Plaintiff each and every time he sought an available building in which to expand his business.

140.   Indeed, in order to even consider the Plaintiff for one of the buildings, the Defendant demanded that the Plaintiff fill out a Business Qualification Questionnaire.(BQQ)

141.   The BQQ requested significant amount of information, including a great deal of information that the Defendant already knew and/or had in its database on the minority Plaintiff.

142.   A BQQ is not a formal requirement by the rules set in place by the Defendant for its current tenant business expansion in a cargo facility, and was only required for the minority Plaintiff in order to stall and/or not provide the Plaintiff with the available building that he qualified for.

143.   No other non-minority business was required to complete a BQQ for business expansion.

144.   Although Don Rivas promised a lease for the more modern Building 263 for 2013, he engineered a two years lease renewal agreement for the minority Plaintiff in its current, outdated, inadequate facility, rather than have a month by month lease agreement.

145.    For twenty years now the Defendant continues to change the requirements for obtaining a larger, more modern building and continues to place obstacles in the path of the minority Plaintiff's business in hopes of driving him to bankruptcy.

<u>Count I-Violation of the Fourteenth Amendment</u>

146.    Plaintiff repeats and re-alleges each and every allegation as set forth herein.

147.    Defendants' conduct violates the equal protection clause of the Constitution.

148.    Indeed, Defendant's conduct was the result of racial discrimination and discrimination based on Plaintiff's national origin.

149.    Defendants' conduct was stark in how they treated the Plaintiff in relation to other non-minorities.

150.    Defendants refused to lease space to the Plaintiff because of his race and national origin.

151.    Defendants imposed numerous requirements upon the Plaintiff that were not imposed on others non-minority.

152.    One example is the requirement of applications and proof to lease space that was not required for non-minorities.

153.    Another example is that the Plaintiff was required to make numerous applications for space, while other, non-minorities, were not required to so much as apply for certain spaces.

154.    Yet another example is the response time for applications to lease space. While the Plaintiff had to wait months and years for a response, other non-minority businesses received answers to their request to lease space in a very short period of time.

155.    The Defendants also requested that the Plaintiff provide a rent payment history, despite the fact that no other company was required to provide such a history when applying for space and that the Defendants had their own records to establish that Plaintiff was up to date with his rent payments.

156.    Additionally, the Defendants sought to discourage the Plaintiff by demanding terms not demanded to other, non-minority owned business, such as the option to be allowed to grow into larger and more modern buildings.

157.    One example is that the Defendants sought to impose a significantly higher rent upon Plaintiff for a leased space, when other non-minority personals and companies were provided market rates.

158.    Another example is that the Defendants would provide rent-credit for tenants that make improvement or rehabilitated spaces, but refused to provide such a credit to the minority Plaintiff.

159.    Indeed, in one stark example, not only did the Defendants require the Plaintiff to pay a significant 2019 rent rate in 2013, but also demanded that Plaintiff spend millions of dollars rehabilitating a building with no rent credit.

160.   Moreover, the Defendants perpetrated this unlawful policy and practice of discrimination of inhibiting minority owned businesses from operating in the cargo arena in JFK airport.

161.   Defendant makes it as difficult as possible for Plaintiff and other minority owned business to apply for empty space, much less obtain, leased space.

162.   In fact, Plaintiff is the only minority owned business conducting cargo services at JFK airport.

163.   The policy was to also "contain" the only minority owned cargo handling business at JFK Airport.

164.   Don Rivas told the Plaintiff's team in a meeting held at his office that he wants Plaintiff to only handle passenger airplane cargo, also called belly cargo, and for Plaintiff not to handle all cargo aircraft.

165.   Which means that Plaintiff cannot compete or bid on major/all cargo air craft accounts; which are being service by non-minority companies only.

166.   But Plaintiff's competitor is able to bid for the Plaintiff's belly cargo business at a far lower rate.

167.   No other non-minority business was treated in the manner Defendants treated Plaintiff.

168.   In fact, non-minority owned businesses were given many privileges not afforded to Plaintiff, including rent credits, fast track applications, waiver of application process, and picking cargo buildings of their choosing.

169.    Additionally, the foregoing unlawful conduct was perpetrated for the better part of about twenty years through the channels of the upper echelon of Port Authority management.

170.    Said practices constitute a policy and custom by the Defendants.

171.    Moreover, Don Rivas, Ralph Tragale, Dean Mancuso and Michael J Ferrigno are senior officials in the Port Authority and their decisions to perpetually discriminate against the Plaintiff constitute a policy.

172.    Defendant Ralph Tragale from the Port Authority New York City head office in 2011 representing building 78 and again in 2012 representing building 86 position himself in Defendant JFK property and leasing office, just to demonstrate his discrimination strength on the minority Plaintiff.

173.    Ralph Tragale's job functions were not and still are not as October 2014 a property and leasing representative of the Port Authority, Tragale cross his job function to purposely discriminate on the minority Plaintiff and to stop him from developing in JFK airport.

174.    As the paragraphs in this Complaint, Donald Rivas blatantly disregarded and violated Plaintiff's rights and cause his injury in losing out on economic prosperity.

175.    Had the Defendants not violated the Plaintiff's rights; he would have been able to acquire a great deal of new business and expansion.

176.    Plaintiff proposed in every occasion since 1995 to make his own cash investment into idle available property that the Defendant has on its property list for leasing and was denied by Defendant because he is a minority.

<u>Count II-Supervisory Liability</u>

177.    Plaintiff repeats and re-alleges each and every paragraph as if set forth herein.

178.    Donald Rivas is a senior official responsible for leasing and property management.

179.    Defendant Rivas directly engaged in violation of Plaintiff's rights by perpetrating the aforementioned conduct.

180.    Additionally, upon information and belief, Donald Rivas was privy to subordinate's actions of unlawfully denying Plaintiff properties in violation of the Constitution.

181.    Indeed, as a senior property and leasing manager, Donald Rivas knew or should have known that the Plaintiff was being unlawfully discriminated against.

182.    Defendant continues to counter propose Plaintiff proposal with much higher rent rate than other non minority competitors just to kill the deal.

183.    Defendant continues to violate its lease agreement with New York City.

## Count III-Injunctive Relief

184.     Plaintiff repeats and re-alleges each and every paragraph as if set forth
herein.

185.     Plaintiff seeks an injunction prohibiting the violation of rights as described
herein.

## Count IV-Retaliation

186.     Plaintiff repeats and re-alleges each and every paragraph as if set forth
herein.

187.     Plaintiff previously filed an action against the Defendants on or about
March 2014.

188.     During that time, the Defendants were discussing a potential lease with the
Plaintiff.

189.     The parties had discussed terms and the Defendants purported that a final
lease would be issued to the Plaintiff.

190.     Once Plaintiff served the Defendants with the February 2014 action, the
Defendants retaliated against the Plaintiff by ceasing to have any discussions
with Plaintiff about a lease.

191.     In fact, the Defendants refused to continue to discuss a potential lease with
the Plaintiff until such time as Plaintiff withdraw his lease.

192.     Defendants thus violated Plaintiff's first amendment rights to freedom of
speech and freedom from retaliation for said speech.

WHEREFORE, Plaintiff demands a Jury Trial, judgment against the Defendants, and an entry of an order that awards the Plaintiff compensatory damages, punitive damages, cost of suit, attorney's fees, plus interest, costs and disbursements, as well as an injunction prohibiting the unlawful conduct, together with any other relief the Court finds to be just and proper.

Dated: October 5, 2014                                   By Plaintiff's attorneys,
                                                         Aymen A. Aboushi
                                                         Aymen A. Aboushi, Esq.
                                                         The Aboushi Law Firm PLLC